There we go. All right. Welcome. Um, all right. Our next case is Kristensen versus United States. We'll first hear from Mr Schreiber whenever you're ready. Council. Yes, Your Honor. Joseph Schreiber, representing the plaintiff appellants. May it please the court. There are three clear reasons why the district court's ruling should be reversed and the case rendered. First, the district court's ruling that mandatory army and D O D regulations were aspirational and mere guidance was legally wrong. When the factual findings were analyzed through this lens of incorrect legal rulings, incorrect conclusions resulted. Second, the district court misapplied Texas foreseeability law. The district court looked on Lee at what was actually known by the Family Advocacy Risk Assessor after the seven day deadline had passed and not under Texas law. What reasonably should have been known had they followed the regulations. Third, the district court erroneously concluded that the army's duty to the neighbors was based on the neighbors reliance on the military on the night of the shootings rather than the fact that the neighbors were foreseeable victims of the domestic violence rampage of specialist Giffa and were actually injured during the course of that rampage. Each of these three incorrect legal rulings cause reversible air, which is reviewed under the de novo standard. The court should reverse and render. There are enough facts in the court, the trial courts, findings of facts and conclusions of law that when applied to the correct legal standards military and it should be should cause a rendering excuse me should cause a rendering of our complaint is favor. Um, there were three facts that were undisputed that are in the record in our briefs that weren't part of the district court's finding the facts and conclusions of law. Those are the army told Don Giffa unequivocally in writing that if she had to leave home, she should go stay with close friends. And only if she couldn't stay with close close friends should she go to a shelter or seek help from her family. When Don Giffa was killed, she was staying with those close friends. Secondly, D. O. D. Instruction 6400.06 paragraph 1.1 was not cited by the district court. That paragraph states that it establishes the Department of Defense establishes and assigns duties. The key. The key duty here was the commander's duty to ensure safe housing. That commander, Melissa Miller, testified unequivocally that it was her mandatory duty that she didn't do it. She did not ensure safe housing, and Don Giffa was not in safe housing the night that she was killed. Well, the military doesn't have authority to tell us of, you know, require where a civilian is going to move. My understanding is they discussed alternative housing. Um, and that those those opportunities weren't, um, taken up. Your honor, the record shows that the paper that was given to Don Giffa by the only person to discuss it with Don Kendra Williams, the victim advocate, specifically says that she should go stay with close friends. Whatever Miss Williams said to Don private or separately that wasn't written down, by the way, or sent to the family advocacy program. The fact that it was written down, she should stay with close friends is actually negligent of what she said was true, that Don shouldn't go there, that the army is simply offering or giving the, um, the number of a shelter doesn't ensure safe housing has been secured. Excuse me. So what I thought there was I thought there was discussed the opportunity to move through the army. The army would help her with the relocation. There was some testimony by Miss Williams where she said in court that she talked to Don about there being programs for army assistance to move. However, she did not take Don to where she ever wherever she had to go, tell her how to get this help or help her get an I. D. So she could get some of that help. Dawn's main problem when she came to the military for help was that she did not have her I. D. S. Those had gone missing her I. D. S. Her credit cards for money, but mostly the I. D. S. She was a Canadian citizen, and that was what she asked the military initially for help with. That's what the command said they would help with, and everything flowed from that. The answer your question on her apologize. Well, I guess it just comes back to it sounds like the record, at least the district court found, um, that she didn't want to avail herself of these other opportunities, and she was content and with living with the friends. I think my point is the military can't. It's up to her. Ultimately, it's my is the point. Of course, the military can abduct a spouse and tell her she has to go somewhere. What the spouse did here in the negligent undertaking cause of action is the spouse relied on the military for help when she came to the military for help and relied on them. They specifically told her in writing. Ms Williams told her in writing if she had to leave to go stay with close friends, and that's exactly what she did. She had to leave when specialist gift was let out from his no contact order or left. Then she went to stay with those close friends. In other words, while I couldn't force her to go somewhere else where they told her to go was actually negligent. Yeah. May I continue your the three regulations at issue here. The three key ones is Army Regulation 608 18, particularly Appendix C nine, which sets out three mandatory deadlines. We say they're mandatory because they use mandatory language. They state that part a the following must be completed within 24 hours of a report. That's a spouse abuse assessment that never happened for gone. The following must be completed within 72 hours. The child abuse assessment, the most important one within seven days of receiving a report of abuse. The social worker will query every collateral organization involved in the case and obtain any pertinent information. The negligence in this case, your honor, is there is a whole system set up by the military where disparate sources of the S. I. R. The serious incident report the victim advocate report what's in the 287 care hotline report what the commanders know what the sergeants know all those risk factors are supposed to get to one person who is a trained risk assessor, which in this case was Gwendolyn Farmer. That didn't happen. It's supposed to happen in seven days. These regulations use the word must shall and will. The army knew how to make, um, make regulations that were discretionary. In fact, the army used the word discretion three places in 608 18 and also use should and may in other places. But here it said must. What happened here was that no assessment of specialist gift was made until nine days and the session never got it. The mandatory commanding general policy letter number three is the second mandatory order that states that when there's been a report of abuse, any soldier involved in the abuse, not that is the aggressor, but involved in has to get immediate uninterrupted recommended treatment. He got no treatment whatsoever. Nothing was recommended. In this case, had he been given some treatment within seven days during that period when there was a no contact or when information was supposed to be found, that would have significantly decreased the risk. Instead, he was sent back out into a very volatile situation, having had no treatment whatsoever. And that is frankly negligence. They did not follow their own mandatory guidelines. The third is assume you're right that these were mandatory guidelines and not just aspirational or deadlines. I'm what's your evidence of causation? In other words, that if if the military had met the deadlines that this horrible event wouldn't have happened because it does seem that the flavor I get from the trial court's ruling and a lot of the record is that this was, you know, no, no one saw. I mean, it's just a foreseeability to danger. I mean, the problems, but no one saw that this type of danger was was likely to occur. Your Honor, Kendra Williams, the victim advocate, testified in court that she saw the danger. She saw the risk of serious death to dawn Giff. That was not reported up to the family advocacy program that the risk factors that were there. So if they met these deadlines, what would have been done to prevent this danger from from coming to fruition? One specialist Giff would have been an immediate uninterrupted mental health counseling to help him deal with the stressors he was undergoing. The stressors of the divorce, the allegations of infidelity, the separation, the allegations of financial difficulties. He would have been treated. That would have significantly decrease the risk. Secondly, dawn Giff would have been somewhere else aside from two doors down that she would have been had her I. D. S. She could have left. She would have been warned about in life. They met the deadlines. I guess I'm not sure the connection there. I mean, I mean, she was interviewed. She went to that meeting there. Um, she didn't raise any concerns of this magnitude. So how would how would just meeting the deadlines have led to her not being at the friends? Um, when dawn was assessed, it was not by the family advocacy program. It was assessed by the victim advocate. It was a very brief first line interview that was supposed to get up to the risk assessor. Dawn's main concern at that point was not having I. D. S. Not having money and emotional abuse by her spouse. She had just had a no contact order entered against specialist Giff for seven days. So for seven days she was feeling like she had some control over the situation and she was going to be helped. At that point, there was no cry for help out. There is testimony in the record from the might come home. She testified that if you let him go, he'll kill me. What dawn said? Um, there was there was fear by dawn. Giff. Ah, the causation argument. She wouldn't have been at the other part of the causation is her father, Donnie Larson, testified that he had helped on in the past that he would have helped on had she reached out. And after the killings, what he did was he came down and got the son referred to his KL and got him back out of the country without any kind of passport that the family would have intervened and would have helped had the army not had dawn not relied on the army. That was that's the causation we set to show the foreseeability of risk and proximate cause. We can't prove beyond a reasonable doubt. Something else absolutely would have would have happened. We have to show under Texas law a substantial factor, and this negligence by the military was a substantial factor in creating the situation where specialist Gifford melted down and shot his wife and the neighbors. That's your question. Well, you can get you go ahead. The second major problem we have that I mentioned at the beginning was foreseeability, and I believe Judge Costa. You mentioned this as well. At some point, the judge said he found no red flags were found. The problem with the district court's ruling is that the risk assessor didn't look at the information that was out there. The standard in Texas first hundreds of years has not been what was actually known. The standard has always been what reasonably should have been known. If the standard is what was actually known, then you're looking at a conscious and different standard in every negligence case becomes a gross negligence case. That is not the standard in Texas. Gross negligence is rare. Usually what happens is in all the cases we saw as well, what happens is somebody negligently doesn't foresee things that are out there, like the M. D. Anderson case, which is Texas Supreme Court in 2019 and M. D. Anderson. The doctors didn't predict exactly what was going to happen, but they had enough information. They should have foreseen the bad outcome, and that was considered enough by the Texas Supreme Court. Um, the third thing that I'd like to get into is, like I said at the beginning is the duty to the Farina and Guzman plaintiffs, the neighbors. The duty of the Farina and Guzman plaintiffs is based on them being foreseeable victims of this crime. It is not based on them not calling the police or not when the shooting started. No one says they should have called the military in the started. Their claims are based on the two weeks prior when Don Giff was in a negligent undertaking situation, and they were Don was told in writing to stay with close friends. They were excuse me, the close friends. They were also killed in Tina Guzman severely injured during the course of the domestic violence rampage. Um, Texas law since shortly after Paul's graph has been that people killed or hurt inside a negligent act, a negligent commission that are foreseeable victims. If you're in the zone of danger, per se, then and you're a foreseeable victim, then a duty is owed to you. The same with our and I know that the zone of danger exists because she was instructed to go stay with close friends or neighbors, and they were in as kind of the basis for for your view that they were foreseeable victims of the Army's asserted negligence. Yes, and the fact that the army knew that collateral victims of domestic violence are frequently killed that people who keep in house abuse spouses, like in the Wilburn case in the Wilburn case, which is Sixth Circuit case law. The mother, ex mother in law of, I guess, the domestic violence spouse. She was killed in the course of the domestic violence rampage, and there was no question that she was not a proper plaintiff as well. Decided you cite some femicide studies. Your blue brief page 23. You cite some some studies on femicide. Yes, sir. And are those studies the studies themselves in the record or just citations to the studies? And I've got about 10 seconds left. So when I get going on your time to answer the question, the study should be in the record. It was part of the deposition of Miss Williams when she said she knew about it. Dr Deutsch, who is our are our expert cited to it. I believe the study itself is in the record. If not, certainly the citation is. But that study was known by the army, and the risk factors were known by the army acknowledged. My time is up for now. All right. Anything else? Judge? Will it? No, thank you. Okay, we'll hear now from the government. May it please the court. Jacqueline Crystal is for the United States. Your honors. After listening to testimony from 23 witnesses over the course of a 10 day trial, the district court made a thorough fact based finding that there was not a single element of their negligent undertaking claim. The district court committed no error in this finding, let alone a clear error that would be required for reversal. For at least three independent reasons, this court should affirm the judgment below. First, the district court correctly found that the army exercised reasonable care with regard to the mandatory provisions of its regulations, and that it took affirmative actions after learning of the February 9th, 2015 incident between Specialist Giffa and Mrs. Giffa. Second, the district court held that appellants had failed to establish that they relied on the army, or that the army's actions increased their risk of harm, as opposed to if the army had taken no action at all. Third, the district court correctly found that the army was not the proximate cause of this tragic incident. The district court evaluated foreseeability, and the district court evaluated cause and fact. As to foreseeability, the district court correctly held that there were no red flags. Specialist Giffa had no record of violent tendencies. Even in the moments before this tragedy occurred, no one foresaw that he would become violent. In fact, even after he was holding a gun, Marina Ellis, in talking to her injured mother about who the perpetrator of the crime was, heard from her mother that Marina Ellis thought it may be the boyfriend, rather than Specialist Giffa. So even in the moments leading up to this tragedy, and as the tragedy was unfolding, it was unforeseeable that Specialist Giffa was going to be violent. In addition to these three independent factors, the district court found that the United States did not cover by Army Regulation 608-18, specifically anyone that was not a spouse or a child, as that regulation specifically said that it was for spouses and children of service members. Therefore, the United States was entitled to sovereign immunity with regard to all appellants other than Mrs. Giffa and her child. Now, the district court didn't reach the committee applied to Mrs. Giffa and her child because the court found that the appellants had failed to establish any of the elements of a negligent undertaking claim. Accordingly, the United States asked this court to affirm the judgment of the district court. Now, I'd like to address some of the things that appellants have addressed. The first is the guidelines under Appendix C of Army Regulation 608-18. Now, the district court correctly held that Appendix C, which is titled Guidelines, is not a mandatory directive, but rather aspirational guidelines toward the overarching goals of AR 608-18. Appendix C must be read in a way consistent with the document as a whole, which requires a thorough investigation of a case that will be presented to the case review committee within 30 days. Now, in making its finding, the district court cited to this court's decision in Freeman versus United States as an example of a case where a court treated more formalized and regulatory deadlines as non-mandatory aspirational goals. The district court committed no error in finding that those guidelines in Appendix C were aspirational. Next, I'd like to talk to you about foreseeability. Appellants indicate that the correct standard would have been what could have reasonably been known. The district court correctly used the standard. Foreseeability requires that the injury complained of be of such a general character as might reasonably have been anticipated by the defendant's conduct. What we're looking at is this February 9th, 2015 incident in the driveway between Specialist Giffa and Mrs. Giffa, a rather minor incident. Killeen Police Department is called. They fill out a report. No one is arrested. No charges are filed. And in fact, Mrs. Giffa is cited as the offender of that incident. Fast forward until February 22nd, 2015, and we have this tragic incident. What appellants want you to believe is that the incidents that happened on February 9th necessarily indicated that Specialist Giffa would commit this heinous act on February 22nd, 2015. What they say is the district court should have taken into account what should have recently been known. Well, what the facts demonstrated is that if Mrs. Farmer had gotten the police report from the Killeen Police Department, it would have indicated that Mrs. Giffa was the aggressor, that Mrs. Giffa had slapped Specialist Giffa in the face, and instead of retaliating, he walked away. If Mrs. Farmer had read the 287 hotline report, which was in her file at the time she met with Specialist Giffa, it would have indicated that Don was the aggressor. If Mrs. Farmer had interviewed Major Miller or Sergeant Guerrero or Sergeant Purnell, all of them would have indicated that there were no red flags in Specialist Giffa's record that he was violent. And then Mrs. Farmer did a 60-minute assessment. She was a master-trained social worker. She did an assessment of Specialist Giffa and found that he was low risk. What is more logical is what Dr. Arambula said at trial and the district court cited in the record in its findings of fact and conclusions of law, is that there was some interceding event that occurred after Mrs. Farmer evaluated Specialist Giffa and these murders. What that was, nobody will ever know. But what is clear is that the district court made a thorough fact-based finding that these events that happened on the night of the incident, Specialist Giffa called Mrs. Giffa, asked if he could come over to the Farina home and the Farina said that it was okay. He came over once, he left, and he came back. Mr. Farina, believing that Specialist Giffa might have a gun, telling his wife, I think that Specialist Giffa may have a gun, did not call the police. Instead, his wife approached Specialist Giffa and told him that Mrs. Giffa would not be going home with him. So even in the moments leading up to this tragedy, no one foresaw that it would occur. Finally, for the first time on appeal, appellants raised a zone of danger argument. Regardless, the concept of zone of danger may be applicable in a negligent case, but this is a negligent undertaking case. Appellants could not have pled negligence because then they could not have gotten around the intentional tort exception. Under a negligent undertaking theory, the law is clear that a person's duty to exercise reasonable care in performing a voluntarily assumed duty is limited to the specific duty undertaken. Here, the duty that appellants claim was that under Army Regulation 608-18, which is specifically limited to spouses and children. Now, I want to go back to a couple of other things that appellants discussed. Appellants based their reliance argument and many of them told Don Giffa to live with her neighbors. That is simply not supported by the record, Your Honor. That form that appellants discussed is at ROA 4967, and it was a victim advocate safety plan. Ms. Williams testified during trial that when Mrs. Giffa came in to discuss the services available to her, they filled out that victim advocate safety plan. Ms. Williams gave her the options available to stay at that shelter that the Army contracted with for safe housing purposes that she discussed with Ms. Giffa, the option for relocation funds, as Your Honors have indicated. But she never testified that she told Ms. Giffa affirmatively to stay with close friends. To the contrary, what she testified about is that she discussed the concerns about staying in close proximity to an alleged perpetrator. Now, appellants argue that that's foreseeable, that Ms. Williams foresaw that this event would occur. But that is simply not supported by the record either. Ms. Williams did not testify that she foresaw that this particular incident would happen. What she testified about is that she had knowledge that certain factors could indicate that violence may occur in the future. In reading through Ms. Williams' testimony, Your Honors will see that appellants asked her, well, can't taking ID cards be seen as controlling behavior? And Ms. Williams answered in the affirmative. Appellants are correct that Ms. Williams was not a risk assessor. How could she assess that this risk would occur? Instead, her testimony indicates that she was asked questions by the appellant about her knowledge of what could occur if certain factors were present. And she indicated in the affirmative that she was aware that those things could occur if certain factors were present. She made no evaluation about this specific case or what could happen in this specific instance. In fact, she really had very minimal facts about what was going on as she detailed on the report to the Family Advocacy Program, which she testified she faxed over to the Family Advocacy Program. Appellants indicate also that commanding general policy letter number three requires that as soon as a service member is involved in a domestic incident, that they must attend immediate and recommended treatment. Your Honors, that is simply not the case. A reading of commanding general policy letter from top to bottom indicates that in sub paragraph two, the Department of Social Work conducts its thorough investigation. It presents that thorough investigation to the case review committee. The case review committee determines who is the aggressor in the incident and develops a plan for recommended treatment. The term or what appellants cite to is actually in sub paragraph five. So several sub paragraphs below that one. And sub paragraph five talks about the commander ensuring that their soldier attend uninterrupted recommended treatment. The second part of that sub paragraph talks about the Department of Social Work ensuring that the command is aware of the appointment. So reading top to bottom, what the commanding general policy letter states is the Department of Social Work through the CRC recommends treatment and then commanders had better make sure that their soldiers get to that recommended treatment. The commanders themselves do not recommend the treatment. Your Honors, in closing, this was not a case disposed of summarily in motions practice. Rather, the district court allowed this case to proceed to a two-week trial. They listened to testimony from 23 witnesses. The judge listened to testimony from 23 witnesses. There were hundreds of pages of briefing. In the judge's opinion, he noted that he carefully considered the record, made determinations of relevance, materiality, and credibility of witnesses, and ultimately ascertained the probative significance of the evidence presented. There is a strong presumption that the district court's findings must be sustained, even if this court might have weighed the evidence differently. Can I have you rewind and jump back to the seven-day timeline in Appendix C-9? Can you just give me the best textual, text-centered argument why the timeline, the seven-day timeline there is not mandatory? Your Honor, based on the overarching goals of AR-608-18, I don't want to know. Don't talk to me about goals or purposes. I mean, parse the language of it and tell me why it's aspirational and not mandatory. Your Honor, the language of the appendix of the guidelines does use terminology such as shall. I think that's what you're looking for. Your Honor, but the overarching AR-608-18— Are you trying to say purpose or intent? Yes, Your Honor. Regardless, even if this court found those guidelines were aspirational, it wouldn't have changed the results in this case. As I indicated when we were discussing foreseeability, what if Mrs. Farmer had learned everything in seven days? She actually did the seven days after the C-9 incident. What if she had every single shred of evidence out there within the seven days? This incident still would not have been foreseeable. Even if this court found that those guidelines were mandatory versus aspirational, that simply goes to one element of the negligent undertaking theory. It would only go to reasonable care. There's still several other elements that appellants were required to establish, and they just didn't, Your Honor. Before I chimed in, you were talking about how the district court heard from all these witnesses, and they were so painstaking and thorough in their findings. I guess one question I have is, if you could clarify, when we're looking at—when we're determining whether that seven-day timeline is aspirational or mandatory, when we're looking at whether the Department of Defense instruction was mandatory or not, do we owe any deference to the district court's conclusion? Are we kind of looking at that with fresh eyes in a de novo way, or is there any measure of deference we owe what the district court found? Well, Your Honor, it is a question of law as to whether or not those mandatory. So that is a de novo review, Your Honor. But the court's application of the facts to the law is reviewed for clear error. And since this was a bench trial where the judge was able to assess the credibility of all of these witnesses and make a thorough finding, then this court should give the trial court deference on those findings. This question about the memos, whether they're mandatory or not, I think also goes to the discretionary function exception. Do we have to decide that first because it's an issue of whether sovereign immunity's been waived, or could we just consider some of these other issues you've talked about—trial findings on other elements? Well, Your Honor, as you know, the intentional tort exception bars any claims that are related to the employment, in a nutshell. And so that is why appellants had to plead a theory outside of the employment of specialist GPA. That's where we get to the negligent undertaking claim. Right. There's also an issue there with the discretionary function exception, because discretionary decisions also aren't actionable. There's no liability. Yes, Your Honor. And the district court did analyze the discretionary function exception, although the district court did find that certain provisions of those regulations were mandatory, and therefore the discretionary function exception would not apply to those mandatory provisions of those regulations. The district court did find that AR 608-18 had some mandatory and some discretionary elements to it. The commanding general policy letter was mandatory. I'm probably not being clear with my question. I know what the district court found. Are those preliminary jurisdictions—sovereign immunity—that have to be decided first? Well, I think that if this court finds that there is sovereign immunity, clearly, then this case, there is no jurisdiction. And I don't think I'm answering your question, Your Honor. It's fine. I mean, what I'm saying, do you think we have to decide the discretionary function exception? Is that a threshold jurisdictional issue? Because it goes to whether the conduct being challenged is something for which the United States has waived its sovereign immunity. Are these just all a bunch of issues that we can tackle in whatever order we think makes sense? I don't think that you have to look at those issues initially, because the district court did find that that regulation was mandatory. So, I don't think that you have to tackle those issues initially. Although, as the district court found, the United States was entitled to sovereign immunity with everyone, with the exception of maybe Mrs. Giffen, her child. Thank you, Your Honor. All right. You have a rebuttal, Mr. Schreiber? I think you're muted. Oh, yeah. Mr. Schreiber, you're... Yeah, there you go. Am I good? I lost 12 seconds. I'll try and make it up. The district court ruled that the discretionary function exception did not apply. It also ruled that the intentional tort exception did not apply to Dawn Giffen. Those rulings are not on appeal. Those are exceptions to the Federal Tort Claims Act. Once the court finds the Federal Tort Claims Act applies, then those are exceptions that would have to be proved. We did not plead any intentional act or any cause of action that required looking at responding as superior, like is in Lelich's case. So, those, in my opinion, are off the table. One thing I'd like to jump to is, I got accused of distorting the facts. I'd like to state that under tab seven in our trial excerpts, which is the Domestic Violence Safety Plan, at page 4967, part F, says, these are the words it says, if I have to leave my home, I will go colon close friends. I should decide this even if I don't think there will be a next time. If I cannot go to the location above, then I can go stay with family or families in crisis. That's literally what Ms. Williams handed to Dawn Giffa. It says where she should go, and if she couldn't go there, then she could go to the shelter. Also, the CRC, I don't know if you heard that term, that's the Case Review Committee, they meet at 60 days to determine whether or not an allegation was substantiated or unsubstantiated. The regulation issue that the government is trying to parse, in large part, is commanding general policy letter number three, which says commanders will ensure that soldiers involved in family violence attend immediate and uninterrupted recommended treatment. The garrison commander, Colonel Elledge, stated that immediate doesn't mean 10 days. Immediate doesn't mean you wait 60 days until there's a meeting of this full CRC to see whether it's true or not. You get whoever's involved in treatment. I think it's also important to talk about this idea that... Oh, let me back up and do something else. The rules of construction we discussed a minute ago, it's a standard rule of construction under Texas law and, I believe, federal law, that in applying ordinary rules, courts should interpret statutes or regulations in a way that avoids rendering any language superfluous and to give effect, if possible, to every word and clause in a statute. The court should not have read out will and shall. It shouldn't have read will to be should. Also, findings of fact influenced by an erroneous view of law are entitled to no deference. That's the Fifth Circuit v. McFerrin. That was an IRS regulations case. So this court actually owes no deference to findings of fact that are based on erroneous legal conclusions and erroneous legal lens. What happens if the court upholds Judge Ezra's decision and says that seven days doesn't mean seven days, that 24 hours doesn't mean 24 hours? I think what you'll see is that every defendant in the country who's a regulated entity can look back at Christensen v. U.S. and say, hey, we just couldn't staff up. We didn't have time, because that was the excuse that Ms. Farmer gave. She didn't have time when she got this. She gave a listing of all she would do in a normal situation under a normal standard of care investigation, which was talk to the soldier twice, talk to the spouse, or at least write down she couldn't, and then go through and look at the documents. The fact that she didn't have time doesn't mean the And it means that any other defendant can come in and say, hey, we just didn't have the staff to do airline maintenance. We didn't have the staff to check meat safety. We didn't have the staff to see if drugs were safe and effective. And I think that's a slippery slope that gets hurled over pretty quickly. The last thing I'll talk about in my last 45 seconds is this idea that Dawn voluntarily interacted with Specialist Giff and went to the I think it uses a wrong standard for foreseeability and predictability as well. The testimony was that when Specialist Giff was let out, he went, he told Dawn to come home twice, and she did. The time she didn't, she was killed. Far from being voluntary, she was compelled to go home, because if she didn't, she was killed. That smacks of blaming the victim and saying she had it coming. All this testimony about blaming the victim, that she was angry, that she did everything listed on the SIR, which is under, it's our tab number nine, the listing of the risk factors. If that's all true, there's a seriously volatile situation. And I'm right out of time, Your Honors. All right. Thanks to both sides for the argument in this important case. You may now excuse yourselves from the Zoom. Thank you, Your Honors.